UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHRYN A. BLETZ, Personal Representative
of the ESTATE OF FRED BLETZ, Deceased,
and KATHRYN A. BLETZ, individually

        Plaintiffs,

v.

TRAVIS GRIBBLE, and BRENT DENNY,
individually, jointly and severally,

        Defendants.

_____/

CASE NO. 1:08-CV-533

HON. ROBERT J. JONKER

## OPINION

     Plaintiff Kathryn Bletz brings this action individually and as representative of her deceased husband's estate, alleging that Defendants Travis Gribble and Brent Denny are liable under 42 U.S.C. § 1983 and Michigan state law for fatally shooting her husband in the Bletz family home and unlawfully restraining her during and following her husband's death. Defendants assert they are entitled to qualified immunity, and move for summary judgment on all claims. (Docket # 26.) Ms. Bletz cross-moves for summary judgment on her individual claims, and opposes summary judgment on her husband's claims. (Docket # 30.) The Court heard oral argument on these motions on January 8, 2009. (Docket # 32.)

## BACKGROUND

     Defendants Gribble and Denny are Ionia County police officers. Gribble is a sergeant; Denny is a deputy. On the evening of May 3, 2005, Deputy Denny consulted a list of outstanding arrest warrants for residents of the Village of Saranac, Michigan. In looking over the list, Denny

recognized the name of Zachary Bletz. (Denny Deposition at 23-24.) Zach Bletz's name was on the outstanding warrant list because he had failed to appear at a March 2005 court hearing in a neighboring county on misdemeanor drunk driving charges. The warrant list indicated that Zach resided at his parents' home in Saranac. (Denny at 24.) As it turns out, Zach Bletz no longer lived at his parents' home, but he happened to be visiting there on May 3, 2005. (Zach Bletz Deposition at 7.) Officers Denny and Gribble knew that Zach's parents, Fred and Kathryn "Kitti" Bletz, resided at the home.

Later that night, Deputy Denny contacted Sergeant Gribble and they decided to drive out to the Bletz family residence to arrest Zach. Officers Denny and Gribble arrived at the Bletz home at approximately 11:40 p.m. (Denny at 31; Gribble Deposition at 70.) The house was dark when they arrived, except for one "light or a TV or something" in a second-floor bedroom. (Denny at 33-34.) Denny and Gribble pulled into the driveway in separate, marked police cars. Neither officer activated their police siren, and they both turned off their headlights as they pulled into the driveway. (Denny at 31-34.) They drove to the rear of the house and parked their cars thirty to thirty-five feet away from the entrance. (Denny at 31.) At that point, both officers exited their cars and Deputy Denny approached the home and knocked on the door.

## I.     Defendants Encounter Zach Bletz

Fred and Kitti Bletz were in bed sleeping when Defendants arrived. Zach was watching television in the upstairs bedroom. He did not hear a knock on the door, but he did hear his dog barking loudly. (Z. Bletz at 17-18.) He went downstairs to check on the dog, and when he reached the door he saw Defendants standing on the back lawn, just off the steps leading to a breezeway on the southwest side of the home. (Z. Bletz at 18-19; *see also* Gribble at 81-85.) Zach, who was

wearing shorts, a t-shirt, and slippers, exited the door onto the breezeway steps and identified himself to Defendants. (Z. Bletz at 19-22.) Denny informed Zach that the officers were there to arrest him on the warrant. All parties agree that Zach was cooperative with Officers Denny and Gribble.

Zach Bletz still was in slippers at the time of his arrest. According to Bletz, either Denny or Gribble ordered him to go inside and put on shoes to wear to jail. (Z. Bletz at 22, 26.) Denny and Gribble testified that Zach asked to enter the house to get shoes, and they informed him he could do so only if they came inside with him. (Denny at 38-40, 43; Gribble at 84.) In any event, Zach reentered the house through the breezeway door, and the officers started to follow him into the house. Zach testified that he turned to close the breezeway door behind him, but Deputy Denny forced the door open with his hand and his gun. (Z. Bletz at 26-27.) Zach asked, "Do you have a warrant?" (Z. Bletz at 26.) Neither officer responded. Instead they ordered Zach to restrain his dog so they could safely enter the house. Zach corralled the barking dog, passed through the breezeway, and entered the house via a door to the kitchen. (Z. Bletz at 26-29.)

## II.     Defendants Enter the Breezeway and Encounter Fred Bletz

Defendants waited in the breezeway while Zach took the dog down a hallway toward the back of the house. There were no lights in the breezeway, but there was a dim glow in the kitchen. (Denny at 48.) Prior to entering the breezeway both Denny and Gribble had seen through the kitchen window a person–who they later learned was Zach's father, Fred Bletz–standing or walking through the kitchen. (Denny at 47-48; Gribble at 87-89.) Gribble "flickered" his flashlight towards the window in an attempt to get Fred's attention, and Fred "abruptly moved away from the window." (Gribble at 91-92.) Gribble alerted Denny to Fred's presence, but neither officer asked Zach Bletz

who the man was or what he was doing in the kitchen.[1]  At the time Defendants entered the breezeway they could no longer see Mr. Bletz and did not know where he was in the house.  (Denny at 48-52; Gribble at 96-99.)

Defendants were standing in the breezeway when Denny observed through the open kitchen door a long-haired man in underwear and a t-shirt pointing a gun at him.  That man was Fred Bletz. The ensuing encounter between Mr. Bletz and Defendants lasted just six to ten seconds.  (Denny at 65-67.)  Denny shouted "Gun!" or "He's got a gun!," and both officers crouched in the corner of the breezeway.  (Denny at 60-61.)  Gribble shined a flashlight at Fred Bletz and yelled at him to "put the gun down!" or "put the fucking gun down!"  (Z. Bletz at 29-31.)  Fred, who had poor vision and hearing and was not wearing glasses or a hearing aid at the time,  repeatedly asked, "Who are you?" (Z. Bletz at 29-30.)  Gribble asserts that he yelled "Sheriff's Department!"one time,  but Denny does not recall ever hearing Gribble say those words.  (Gribble at 109-113; Denny at 61-62.)  Denny admits that he never identified himself as a police officer to Fred Bletz.  (Denny at 61-62.)

When Fred Bletz did not immediately drop his weapon, Sergeant Gribble fired four shots at Fred, striking him once.  (Gribble at 118.)  Fred Bletz did not fire any shots.  In fact, his gun was not loaded. Gribble testified that Fred was pointing a gun directly at him when he fired, but Zach Bletz testified that his father was lowering his weapon when Gribble fired.  (Z. Bletz at 31-32, 57-58.) Denny could not see any part of the standoff because his face was "buried into a corner" of the breezeway.  (Denny at 63-68.)  Defendants concede Fred Bletz died as a result of the gunshot.

---

[1] The officers' testimony on this point is inconsistent.  Denny testified that Gribble asked Zach Bletz about the person, and that Zach did not answer Gribble's question.  (Denny at 48-52.) Gribble testified that he never asked Zach about the person in the window.  (Gribble at 96-97.)

### III.    Defendants Encounter Kitti Bletz

After Sergeant Gribble shot Fred Bletz, he and Deputy Denny rushed into the house through the kitchen door.  Deputy Denny immediately handcuffed Zach Bletz, who already was laying face-down on the kitchen floor.  (Denny at 70.)  Gribble kicked the gun out of Fred Bletz's hand, and both officers entered the dining room, where they encountered Kitti Bletz.  Ms. Bletz had awoken and exited the bedroom into the living room or dining room.  (K. Bletz at 60-68.)  Gribble ordered Ms. Bletz to the ground and either he or Deputy Denny handcuffed her.  Denny then removed Kitti and Zach Bletz from the house and placed them, still handcuffed, in separate, locked police cars parked outside the Bletz home.

Ms. Bletz and her son were cuffed and held in police custody for approximately three hours.  After they were removed from the home, Michigan State Police Troopers, medical personnel, and news reporters arrived at the scene.  (K. Bletz at 89-92.)  Sometime thereafter, Kitti and Zach were transferred from Defendants' patrol cars to state police cars.  They were released from police custody later that night, after Fred Bletz was pronounced dead on the scene.

### IV.    Procedural History and Summary of Claims

Plaintiff Kitti Bletz originally filed this action as two separate cases in Ionia County Circuit Court.  (Brief in Support of Removal, docket # 2, Exhibits 1B, 3C.)  One complaint asserts claims arising under state law, and the other complaint contains claims arising under federal law.  The state court consolidated the two cases, and Defendants removed the consolidated action to this court.

Plaintiff claims Defendants are liable under 42 U.S.C. § 1983 for violating her and her deceased husband's Second, Fourth, Fifth, Eighth and Fourteenth Amendment rights.  (Notice of Removal, docket # 2, Exhibit 1B, May 1, 2008 Complaint.)  Plaintiff claims Defendants are liable

under state law for gross negligence and assault and battery in the killing of Fred Bletz, and false imprisonment, false arrest, and assault and battery of Kitti Bletz. (*Id.*, Exhibit 3C, December 21, 2007 Amended Complaint.) Ms. Bletz also asserts a bystander liability claim based on her witnessing her husband's death. Defendants move for summary judgment on all claims.[2] (Docket # 26.) Plaintiff opposes summary judgment for the Defendants and cross-moves for summary judgment on her own individual Fourth Amendment and state law tort claims.[3] (Docket # 30.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Jones v. Potter*, 488 F.3d 397, 402 (6th Cir. 2007); FED. R. CIV. P. 56. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The ultimate question is "whether the evidence presents a

---

[2] Defendants purport to move for summary judgment on all claims, but they fail to mention Plaintiff's bystander liability claim in their moving papers or supplemental briefing. In the absence of any evidence or argument from Defendants on this point, the Court will deny Defendants' motion for summary judgment on that claim based on lack of development at this time. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[3] Plaintiff appears to have abandoned all claims under the Fifth and Eighth Amendments, as well as her own claim under the Second Amendment. Defendants argue that those Constitutional Amendments are inapplicable to the facts of this case, and Ms. Bletz does not address any aspect of those claims in her briefing. Consequently, the Court will grant Defendants' motion for summary judgment to the extent of dismissing all claims under the Fifth and Eighth Amendment, and Plaintiff Kitti Bletz's Second Amendment claim, based on lack of development and failure to respond as required under FED. R. CIV. P. 56. *See McPherson*, 125 F.3d at 995-96.

sufficient disagreement to require submission to a jury or whether it so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Defendants' motion for summary judgment raises the defense of qualified immunity. Under federal jurisprudence interpreting 42 U.S.C. § 1983, state and local officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). In Michigan, governmental officials are immune from state law intentional tort claims if (1) the official reasonably believed he or she was acting within the scope of his or her legitimate authority; (2) the acts were taken in good faith; and (3) the acts were discretionary. *Id.* at 315-16; *Odom v. Wayne County*, 482 Mich. 459, 468 (2008).

The federal and state immunity tests may differ slightly in form, but they address the same basic question: when can government officials be held liable for the injuries they cause in the course of performing official duties? *See*, *e.g.*, *Grawey,* 567 F.3d at 315-16 (analyzing official immunity in the context of federal and Michigan state law claims). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Because qualified immunity is immunity from suit, not just liability, immunity questions should be resolved at the earliest possible stage in the litigation. *Id.* However, the doctrine of qualified immunity–or, in Michigan law, "governmental immunity"–does not otherwise upset the traditional summary judgment analysis. *See id.*; *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Grawey,* 567 F.3d at 309.

The Court still must view all facts in the light most favorable to the plaintiff. *Id.* If the evidence would allow a reasonable jury to find that Officers Denny and Gribble violated Fred or Kitti Bletz's clearly established constitutional rights, qualified immunity provides no added protection from suit or liability, and Defendants' motion for summary judgment must be denied. *Id.*

## ANALYSIS

### I. Federal Constitutional Claims Under 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, Plaintiff must show that Defendants violated a federal constitutional or statutory right while acting under color of state law. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). There is no dispute as to the second element of this test. Defendants were uniformed police officers attempting to execute an arrest warrant while on duty. They plainly were acting under color of state law. The Court must determine only whether the evidence in the record would allow a reasonable jury to conclude that Defendants violated Fred or Kitti Bletz's Second, Fourth, or Fourteenth Amendment rights. If the Court finds a constitutional violation, the question then becomes whether the right alleged to have been violated was clearly established at the time of the violation. *Harlow*, 457 U.S. at 818; *Pearson*, 129 S. Ct. at 815. In making these determinations on summary judgment, the Court must look at the facts in the light most favorable to the non-moving party.

### A. Defendants are Not Entitled to Qualified Immunity on Fred Bletz's Fourth Amendment Claim.

Plaintiff alleges Defendants violated Fred Bletz's Fourth Amendment rights when they shot and killed him in his home on May 3, 2005, while trying to execute an arrest warrant for Fred Bletz's adult son. The officers had no arrest warrant for Fred Bletz himself, and no search warrant for his

8

home.  The Fourth Amendment protects an individual's right to be free from unreasonable search and seizure.  *Graham v. Conner*, 490 U.S. 386, 394-95 (1989).  A police officer's lawful authority to arrest, detain, or otherwise "seize" a free citizen necessarily carries with it the right to use some degree of force, but the Fourth Amendment requires that the force used be "objectively reasonable in light of the facts and circumstances confronting [the officer]."  *Id.* at 397.  "[W]hether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests, against the countervailing governmental interests at stake."  *Id.* at 396 (internal quotations omitted).

There is no question Defendants "seized" Fred Bletz within the meaning of the Fourth Amendment when they shot and killed him in the privacy of his own home.  Defendants argue this seizure was objectively reasonable as a matter of law because Mr. Bletz was, at least at one point in time, pointing a weapon at them.  *Cf. Garner v. Tennessee*, 471 U.S. 1, 8-9 (1985) (holding that a police officer may use deadly force when the officer has probable cause to believe a suspect poses a threat of serious physical harm to the officer or others).  The Fourth Amendment certainly accommodates a police officer's need to protect himself from serious bodily harm, but it does not grant the officer a license to kill with impunity whenever he encounters an armed person, regardless of the circumstances of the encounter.  *See id.*; *Cf. Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) ("[O]nly in rare instances may an officer seize a suspect by use of deadly force.").  Thus, it is not enough for Defendants simply to assert that, at the precise moment Sergeant Gribble pulled the trigger, Fred Bletz held a weapon in his hand.  Rather, the Court must analyze the facts and circumstances present in the moments leading up to the shooting to determine whether, under "the

totality of the circumstances," Defendants' actions were objectively reasonable. *See Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (quoting *Garner*, 471 U.S. at 9).

The facts and circumstances in this case are no better for the Defendants than those in *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991). In *Yates*, the defendant police officer responded to a disturbance call by entering a dimly lit apartment building at 2:45 a.m. *Id.* at 445. The defendant encountered four startled guests of the building in the hallway, but he did not identify himself as a police officer. *Id.* It was too dark to see clearly in the hallway, and the guests apparently thought they had encountered an intruder. *Id.* A brief scuffle ensued, and the defendant officer shot and seriously wounded the plaintiff Jerome Yates. *Id.* The Sixth Circuit held that the officer's conduct was not objectively reasonable, and denied the officer qualified immunity from Mr. Yates' Fourth Amendment claim. *Id.* at 447 ("An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent."). *Yates* remains good law, and the Sixth Circuit, as well as district courts within the circuit, continue to apply it in excessive force cases. *See, e.g.*, *DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418 (6th Cir. 2006); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974 (N.D. Ohio 2008). On the strength of *Yates* alone, Defendants' motion for summary judgment on Fred Bletz's Fourth Amendment claim must be denied.

In some ways, this case is even more clear-cut for Plaintiff than *Yates* and its progeny. Those cases address difficult questions of how to analyze a series of events leading up to the moment a police officer makes the decision to seize a free person by use of deadly force. *See DeMerrell*, 206 Fed. Appx. at 427-28 (discussing *Yates* in the context of the Sixth Circuit's so-called "segmenting approach," which requires the court to "analyze the events surrounding the § 1983 claimant's death

in temporal segments"); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (summarizing *Yates* and noting that "[t]he time-frame is a crucial aspect of excessive force cases"). Given the evidence in the record in this case, the Court is doubtful that such an inquiry is even necessary here. Zach Bletz testified that, at the moment Sergeant Gribble fired his weapon, Fred Bletz was lowering his gun. (Z. Bletz at 31-32, 57-58.) Defendants dispute this fact, but at this stage of the proceeding the Court must credit Zach's testimony on this point. Defendants' briefs largely gloss over this critical factual dispute, and fail to make any reasoned attempt to explain how it could ever be objectively reasonable as a matter of law to shoot Mr. Bletz while he was lowering his weapon in compliance with Defendants' repeated requests to "put the gun down" or "put the fucking gun down!" (*See* Z. Bletz at 29-30.) Viewing these facts in the light most favorable to Plaintiff, the Defendants must establish that the free citizens of this country, including Fred Bletz, lack a clearly established right to be free from deadly police force while complying with police commands to disarm. Of course, Defendants could never sustain such a claim, and so their motion for summary judgment must be denied. *See Murray-Ruhl v. Passinault*, 246 Fed. Appx. 338, 343 (6th Cir. 2007) ("If the legal question of immunity is completely dependant upon which view of the facts is accepted by the jury, the district court should not grant immunity from a deadly force claim.") (internal quotations omitted); *accord Yates*, 941 F.2d 444 (denying summary judgment where defendant's arguments "focus[ed] on the merits of the case under the pretext of addressing qualified immunity").

Even if the Court accepts, for purposes of argument, Defendants' unsupported assertion that Fred Bletz posed an imminent threat of bodily harm even though he was lowering his weapon, Defendants still would not be entitled to summary judgment on this record. As a threshold matter, there is a factual dispute about whether Defendants had lawful authority to enter the Bletz home.

An arrest warrant does not automatically entitle police to enter the home of a third person not named in the warrant. *Steagald v. United States*, 451 U.S. 204 (1981). Police may enter a third-party residence to execute an arrest warrant only if they have a reasonable belief that the subject of the warrant resides there and is present at the time of execution. *El Bey v. Roop*, 530 F.3d 407, 415-16 (6th Cir. 2008). In this case, all parties agree that Zach Bletz was outside his parents' home at the time he was arrested. Consequently, Defendants did not need to enter the Bletz home to pursue Zach, and there were no exigent circumstances that would justify their warrantless entry into the Bletz home.[4] Defendants cite no authority for the proposition that police officers may enter a private residence without consent or a search warrant simply because the officers already have arrested a guest–the subject of their arrest warrant–outside the residence.

The lawfulness of Defendants' entry into the Bletz home is just one factor to consider in assessing the overall reasonableness of their actions on the night of Fred Bletz's death. *See Yates*, 941 F.2d 444; *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996) (analyzing the "moments preceding the shooting" to provide context to an excessive force claim). Whether lawful or not, Defendants entered the Bletz home knowing that others were present in the home, yet they failed to announce themselves as police officers or otherwise alert the occupants to their presence. In fact, the record reveals that Defendants made every effort to conceal their identities from the occupants of the home. They arrived at the Bletz residence late at night with their headlights and sirens off, and parked thirty-five feet from the entrance. After encountering Zach Bletz, they entered

---

[4] Defendants maintain that Zach Bletz implicitly consented to their entry when he voluntarily reentered the home to retrieve his shoes, but Zach disputes Defendants' version of the events. According to Zach, Defendants ordered him back into the house and forced their way in behind him with weapons drawn. (Z. Bletz at 26-27.) The Court must credit Zach's testimony on this point for purpose of analyzing Defendants' motion for summary judgment.

the home and crouched quietly in a dimly lit breezeway while an unknown "long-haired man" roamed the house. (Denny at 51-61.) Gribble then fired four shots at Fred Bletz without ever announcing himself as a police officer. (*See* Denny at 61-62.) These are not the actions of objectively reasonable officers. *See Yates*, 941 F.2d at 247 ("It was not objectively reasonable for Currie to enter the dark hallway at 2:45 a.m., without identifying himself as a police officer, without shining a flashlight, and without wearing his hat."). Defendants cannot claim the protection of qualified immunity when their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force. *See id.*; *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 999 (N.D. Ohio 2008) ("[T]he Detectives' objectively unreasonably actions similarly may have caused McCloud to take the potentially threatening response of picking up a knife and hiding in the closet, because he believed the Detectives were intruders."); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) ("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive.").

Defendants' qualified immunity argument largely ignores all facts preceding the shooting, and instead focuses only on the precise moment that Sergeant Gribble pulled the trigger. This argument attempts to justify Defendants' entire course of unreasonable conduct by reference to one split-second decision during which Defendants may legitimately have feared for their lives. And even this argument fails to acknowledge the factual record in the light most favorable to Plaintiff. The Sixth Circuit's "segmenting approach" to excessive force claims does not call for such a narrow inquiry. *See*, *e.g.*, *Claybrook v. Birchwell*, 274 F.3d 1098, 1103-05 (6th Cir. 2001) (discussing the proper segmentation analysis). At the very least, the Court must consider the "moments preceding the shooting" and any other facts conceptually intertwined with the killing of Fred Bletz. *See*

*Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996); *Chappell*, 584 F.3d at 999-1001. That inquiry surely encompasses Defendants' entry into the breezeway and all subsequent events. After all, the entire confrontation between Bletz and the officers took place in a matter of just six to ten seconds. (Denny at 65-67.) Viewing this portion of the record in the light most favorable to Plaintiff, Defendants surprised Fred Bletz by unlawfully and unreasonably entering his home late at night, and then shot him dead when he tried to protect himself from what seemed to be a legitimate threat to his home and his family. Mr. Bletz was not a suspect of any crime, and there is no indication he was attempting to flee the scene. *Cf. Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (discussing factors to consider in analyzing excessive force claims). Under these circumstances, the Court cannot say that, as a matter of law, Defendants' decision to seize Fred Bletz by use of deadly force was objectively reasonable. *See Yates*, 941 F.2d at 247; *Chappell*, 584 F.3d at 1001. Thus Plaintiff has produced evidence sufficient to allow a reasonable jury to find that Defendants violated Fred Bletz's Fourth Amendment rights. *Id.*; *Graham*, 490 U.S. at 397.

The second step of the qualified immunity analysis asks whether the right alleged to be violated was clearly established at the time of the violation. *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009); *see also Pearson v. Callahan*, 128 S. Ct. 808, 818 (2009). There is no doubt that Fred Bletz's right to remain free and secure in his own home was clearly established at least as far back as the *Yates* decision in 1991. *See Chappell*, 584 F.3d at 1003. The facts of this case are in many respects identical to *Yates*, and regardless of the level of specificity used to describe Fred Bletz's Fourth Amendment rights, Defendants' actions were objectively unreasonable on this record, when viewing the facts in the light most favorable to Plaintiff. Consequently, Defendants are not entitled to qualified immunity.

14

**B.      Neither Party is Entitled to Summary Judgment on Kitti Bletz's Fourth Amendment Claim**

Plaintiff alleges Defendants violated her Fourth Amendment rights when they handcuffed her at gunpoint immediately following the shooting, and left her handcuffed in the back of a locked police car for approximately three hours. Defendants argue that Ms. Bletz's prolonged detention was objectively reasonable under the circumstances because they needed to secure the scene of the shooting. Both parties move for summary judgment on this issue. (Docket ## 26, 30.)

**1.      Defendants are Not Entitled to Qualified Immunity on Kitti Bletz's Fourth Amendment Claim.**

There is no question Kitti Bletz was "seized" within the meaning of the Fourth Amendment. *See*, *e.g.*, *Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999) ("The handcuffing and detention of Plaintiffs with the display of firearms certainly deprived Plaintiffs of their freedom of action in a significant way, and thus constituted a seizure."). Defendants assert that the seizure was objectively reasonable as a matter of law, not because they had probable cause or even a reasonable suspicion to suspect Kitti Bletz of any crime, but because they needed to secure the scene of the shooting and conduct an investigation. Defendants' briefing on this point implies, without any record support, that Kitti Bletz posed a threat to their safety or in some other way attempted to interfere with their investigation. (*See* Motion for Summary Judgment, docket # 26, at 10-11; Supplementary Brief in Support, docket # 37, at 7-8.) Defendants' argument is without merit.

As a general rule, the Fourth Amendment requires at least a "reasonable suspicion" of criminal activity before police may seize a free citizen. *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). However, in *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court held that police officers executing a valid search warrant may briefly

detain occupants of the home without a reasonable suspicion of criminal activity. *Id.* at 702-03. Defendants in this case assert that *Summers* provides police with "unfettered control of the situation when executing their lawful enforcement responsibilities." (Defendants' Motion for Summary Judgment, docket # 26, at 11.) This is incorrect. The rule in *Summers* is meant to protect the integrity of the search, minimize the risk of flight in the event incriminating evidence is found, and ensure officer safety during the search. 452 U.S. at 702-03; *see also Muehler v. Mena*, 544 U.S. 93, 98-100 (2005). The *Summers* Court explicitly balanced the individual's Fourth Amendment privacy rights with the officers' countervailing interests. *Summers*, 452 U.S. at 696-705. Nothing in that decision holds or even implies that police have "unfettered" discretion to unreasonably detain innocent persons simply because they are executing a search or arrest warrant. Like any other police seizure, the officers' actions must be objectively reasonable. *See id.*; *Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999) (discussing *Summers* and analyzing the reasonableness of the defendant's actions under the traditional probable cause framework).

A reasonable jury could find that Defendants' detention of Kitti Bletz was objectively unreasonable. Ms. Bletz was handcuffed and removed from her home while her husband lay inside dying. She was held, still handcuffed, in the back of a police car for three hours. The police car was locked so that Kitti Bletz could not exit on her own with or without her hands cuffed. There is no evidence in the record that Ms. Bletz posed a safety risk to Defendants or attempted in any way to interfere with the police investigation in her home. Even if the Court were to defer to Defendants' assertion that they needed to handcuff Ms. Bletz to prevent her from picking up her fallen husband's weapon and turning on the officers, (Motion for Summary Judgment, docket # 26, at 12), a reasonable jury still could conclude that the length and manner of Ms. Bletz's detention were

unreasonable. *See Ingram*, 185 F.3d at 592 (distinguishing between the "limited' and "routine" detention in *Summers* and the excessive detention suffered by the plaintiff). Whatever safety risk Defendants may initially have perceived, the risk surely dissipated as time went on and they secured the scene of the shooting and recovered Mr. Bletz's gun. Defendants do not even attempt to explain why Ms. Bletz needed to remain handcuffed for three hours. *See Muehler v. Mena*, 544 U.S. 93, 103 (2005) (Kennedy, J. concurring) (noting that, even if the initial handcuffing of a person is objectively reasonable, the Fourth Amendment requires that the cuffs "be removed if, at any point during the search, it would be readily apparent to an objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search"); *accord Burchett v. Kiefer*, 310 F.3d 937, 942-43 (6th Cir. 2002). Because Kitti Bletz's Fourth Amendment right to be free from excessive force by handcuffing or other prolonged detention was clearly established, Defendants are not entitled to summary judgment. *See id.*

## 2. Kitti Bletz is Not Entitled to Summary Judgment on Her Fourth Amendment Claim at This Time.

Kitti Bletz cross-moves for summary judgment on her Fourth Amendment claim. (Docket # 30, at 15, 19.) But just because both parties move for summary judgment, does not mean that either party is entitled to it. *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001). The Court has considerable sympathy for the proposition that the record here could not possibly support a constitutional basis for the officers' treatment of Kitti Bletz. However, the record evidence relating to the particulars of Ms. Bletz's detention is limited and would benefit from more factual development. Defendants allude to their safety concerns and efforts to secure the home, (*see* Denny at 72-73; Gribble at 139-41), and Plaintiff does not directly contradict those claims. The

dispute is more one of degree: when, as a constitutional matter, has the officers' conduct crossed the line from arguably defensible for qualified immunity purposes to a plainly indefensible violation of a clearly established constitutional right. Additionally, it appears that Ms. Bletz was at some point transferred from Defendants' control to the Michigan State Troopers who arrived on the scene. (K. Bletz at 83-90.) Plaintiff's briefing does not address the potential import of this point. *Cf. Burchett,* 310 F.3d at 945-46 (denying summary judgment to officers who had knowledge of plaintiff's unreasonable detention, but granting summary judgment to officers who were unaware of the facts and circumstances making the detention unreasonable). Under these circumstances, the Court believes that a jury determination on a fully developed trial record, or at least a renewed motion for summary judgment after plenary discovery, would be the better course of action. Consequently, the Court will deny Plaintiff's motion for summary judgment at this time.

### C. Defendants are Entitled to Qualified Immunity on Fred Bletz's Second Amendment Claim, Even Assuming For the Purposes of Argument that Fred Bletz Can State Such a Claim.

Plaintiff alleges Defendants violated Fred Bletz's Second Amendment rights by "interfering with and depriving" him of his right to possess and display firearms in his home. (Brief in Support of Removal, docket # 3, Exhibit 1B, Complaint at ¶ 35.) Defendants argue that their actions were reasonable responses to an imminent threat of harm, and that, in any event, Plaintiff's Second Amendment right to possess or use a weapon was not clearly established at the time of the shooting.

Plaintiff's Second Amendment claim presents difficult conceptual issues. The Second Amendment prevents the federal government from flatly prohibiting Fred Bletz from possessing a firearm in his home. *See District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). But that is not really the issue here. In the first place, the federal government is not the defendant here. Second,

no governmental authority is attempting to justify a flat prohibition on the right of a citizen to possess a firearm in the citizen's own home. What is at issue here is balancing a citizen's right to brandish or use the weapon against others–others who turn out to be county law enforcement officials in the process of executing an arrest warrant under the circumstances already described in this opinion. This is familiar territory in the Fourth Amendment excessive force analysis, but there is little precedent for such an approach under the Second Amendment where the alleged "deprivation" results from an on-the-spot determination of police officers who assert a reasonable belief that their lives are in danger. At oral argument and in subsequent briefing, Plaintiff conceded that the measure of damages available under her Second Amendment theory would be no different than that available under the other claims in this case, specifically the Fourth Amendment. (*See* Plaintiff's Supplementary Brief, docket # 36, at 9-10.) This Court agrees, and further notes that the entire premise of Plaintiff's Second Amendment claim is subsumed in the Fourth Amendment analysis. This is not a case where Defendants harassed Fred Bletz because they knew he possessed a firearm. Nor is this a case challenging a law or ordinance that restricts gun ownership. *Cf. Heller*, 128 S. Ct. 2783. This case raises one general question: were Defendants justified in using deadly force against Fred Bletz under the circumstances of this case, one of which happens to be Fred Bletz's possession of a firearm at the time. That inquiry is most properly addressed under well established Fourth Amendment principles.

Moreover, even assuming Fred Bletz could state a viable, independent Second Amendment claim, the Court would also conclude in this case that Defendants are entitled to qualified immunity on the claim because it was not clearly established at the time of the shooting–indeed, even today–that citizens have an individual Second Amendment right against state, as opposed to federal,

action. *Heller* itself is limited to federal action, and the Court there expressly noted that previous Supreme Court decisions have held that the Second Amendment applies only to actions taken by the federal government. *See* 128 S. Ct. at 2813 n. 23 (citing *United States v. Cruikshank*, 92 U.S. 542 (1876), *Presser v. Illinois*, 116 U.S. 252 (1886), and *Miller v. Texas*, 153 U.S. 535 (1894)). There is currently a circuit split on this very issue. *Compare Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009) (no incorporation), *and Maloney v. Cuomo*, 554 F.3d 56 (2d Cir. 2009) (same), *with Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) (incorporation). The Sixth Circuit has yet to address the incorporation issue, and this Court need not weigh in on the merits of incorporation because, at a minimum, the circuit split demonstrates the lack of a clearly established Second Amendment right against state action. *See*, *e.g.*, *Cagle v. Gilley*, 957 F.2d 1347, 1349 (6th Cir. 1992) (noting that a circuit split indicates that an issue is "unsettled as a matter of constitutional law"). Consequently, Defendants are entitled to qualified immunity on Plaintiff's claim that they violated Fred Bletz's Second Amendment rights.

> **D.  Plaintiff Cannot State a Substantive Due Process Claim Under the Fourteenth Amendment**

Plaintiff claims that Defendants violated her and Mr. Bletz's substantive due process rights under the Fourteenth Amendment. (Brief in Support of Removal, docket # 3, Exhibit 1B, Complaint at ¶ 35.) Plaintiff articulates no separate theory of relief for this claim; the claim is premised entirely on the events underlying her Fourth Amendment claims.

The Supreme Court has expressly held that "*all* claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard,

rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This claim falls squarely within the holding of *Graham*. Plaintiff alleges she and her husband were subjected to excessive force when Defendants attempted to execute an arrest warrant for a guest of their home. They were free citizens at the time, not pretrial detainees. *Cf. Lanman v. Hinson*, 529 F.3d 673, 680-81 (6th Cir. 2008) (delineating between claims arising under the Fourth Amendment and those arising under substantive due process). Thus, the Fourth Amendment, not substantive due process, determines Plaintiff's entitlement to relief. *See Graham*, 490 U.S. at 395; *see also Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008).

## II. State Tort Law Claims

Plaintiff asserts multiple state law tort claims on behalf of herself and Mr. Bletz. Specifically, Plaintiff claims Defendants are liable for (1) gross negligence as to Fred Bletz; (2) assault and battery of Fred Bletz; and (3) false arrest, false imprisonment, and assault and battery of Kitti Bletz. (Brief in Support of Removal, docket # 3, Exhibit 3C, Amended Complaint.) The facts underlying Plaintiff's state law tort claims are identical to the facts underlying her federal claims. Resolution of Plaintiff's state law claims requires application of Michigan law on governmental immunity. Michigan courts use different tests for governmental immunity depending on whether the claim asserted sounds in negligence or intentional tort. *Odom v. Wayne County*, 482 Mich. 459, 470-71 (2008). Regardless of the type of claim asserted, Defendants bear the burden of establishing their entitlement to official immunity from Plaintiff's state law claims. *Id.* at 479.

**A.    Defendants are Not Entitled to Governmental Immunity on Fred Bletz's Gross Negligence Claim.**

Under M.C.L. § 691.1407, employees of a governmental agency are immune from tort liability if (1) they were acting or reasonably believed they were acting within the scope of their official authority; (2) the governmental agency is engaged in the exercise or discharge of a governmental function; and (3) their conduct does not amount to gross negligence that is the proximate cause of the injury or damage. *Odom*, 482 Mich. at 470. Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(7)(a); *Maiden v. Rozwood*, 461 Mich. 109, 122-23 (1999).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants were grossly negligent in the manner in which they entered the Bletz home and attempted to execute the arrest warrant for Zach Bletz, and that this alleged gross negligence proximately caused Fred Bletz's death. *Cf. Jackson v. Saginaw County*, 458 Mich.141, 146-47, 1998) (discussing the summary judgment standard for gross negligence claims). Defendants' summary judgment motion on this issue raises the same defenses discussed and rejected above in the Court's analysis of Fred Bletz's Fourth Amendment claim. Those defenses are similarly unavailing here. *See*, *e.g.*, *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) ("An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent."). Whether Defendants' conduct constitutes gross negligence under Michigan law is a fact question for the jury. Consequently, Defendants are not entitled to summary judgment on this claim.

**B.      Defendants are Not Entitled to Governmental Immunity on Fred Bletz's Assault and Battery Claims.**

Plaintiff alleges Defendants are liable for assault and battery in the shooting of Fred Bletz. Assault is "an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *People v. Nickens*, 470 Mich. 622, 628 (2004)). Battery is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id.*

Defendants argue they are immune from Plaintiff's assault and battery claims because Sergeant Gribble was acting in good faith when he shot and killed Fred Bletz. (*See* Supplementary Brief in Support, docket # 37, 8-10.) In *Odom v. Wayne County*, 482 Mich. 459, 472 (2008), the Michigan Supreme Court held that the scope of governmental immunity from intentional torts–e.g. assault and battery–under Michigan law is governed by the Court's previous decision in *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984). *Ross* extends immunity to governmental employees where the employee was acting within the scope of his or her authority, in good faith, and was performing discretionary acts. *Id.* at 591; *Grawey v. Drury*, 567 F.3d 302, 315-16 (6th Cir. 2009).

The only issue in dispute on Defendants' motion for summary judgment is whether Defendants were acting in good faith when they entered the Bletz home and shot Fred Bletz. The *Ross* decision did not elaborate on what constitutes "good faith," but the *Odom* Court explained that "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." 482 Mich. at 474 (emphasis in original); *accord Flones v. Dalman*, 199 Mich. App. 396, 401 (1993). Unlike qualified immunity under federal law, "[t]he good faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and

good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Odom*, 482 Mich. at 481-82. However, where a defendant's conduct is objectively unreasonable, the jury may infer bad faith. *See id.* at 475 ("[W]ilfulness and wanton misconduct is made out only if the conduct alleged shows an intent to harm, or if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does."); *accord Grawey*, 567 F.3d at 315-16; *Cf. Flones*, 199 Mich. App. at 405 ("The jury concluded that probable cause was lacking, and was permitted to infer malice from that conclusion.").

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants' actions the night of May 3, 2005 were not taken in good faith. Defendants unlawfully entered a private residence late at night with weapons drawn and shot the owner of the home without announcing themselves as law enforcement. At a minimum, a jury could determine that such conduct demonstrates a "reckless disregard" for Fred Bletz's right to be safe and secure in his home. *Cf. Odom*, 482 Mich. at 474. Police officers who demonstrate a reckless disregard or indifference to another's rights do not act in good faith. *Id.* at 475. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's assault and battery claims.

### C. Defendants are Not Entitled to Governmental Immunity on Kitti Bletz's Assault and Battery, False Arrest, and False Imprisonment Claims.

Kitti Bletz alleges Defendants are liable under Michigan law for assault and battery, false arrest, and false imprisonment. (Brief in Support of Removal, docket # 3, Exhibit 3C.) False imprisonment and false arrest technically are two distinct torts, but they share many overlapping elements. *See*, *e.g.*, *Moore v. City of Detroit*, 252 Mich. App. 384, 386 (2002). The essence of either claim is that plaintiff suffered an "unlawful restraint of his or her personal liberty." *Id.*; *see also*

*Stowers v. Wolodzko*, 386 Mich. 119, 134 (1971). The claims may be plead separately or in conjunction with one another. *See Moore*, 252 Mich. App. at 386-87.

Defendants argue they are immune from Ms. Bletz's assault and battery, false arrest, and false imprisonment claims, but their argument on this point is simply a restatement of their general argument as to Ms. Bletz's Fourth Amendment claim. On this record, application of the governmental immunity doctrine articulated in *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984), does not absolve Defendants of liability. Ms. Bletz was handcuffed and led from her home while her husband was inside dying. She was detained, still handcuffed, in the back of a locked police car for approximately three hours. She was never suspected of a crime and there is no evidence she attempted to interfere with the police investigation following her husband's shooting. A reasonable jury could conclude that there was no reason whatsoever to detain her in this manner for such a lengthy period of time, and that Defendants' conduct showed a "reckless disregard" for her right to be free from unlawful restraint. *Cf. Odom*, 482 Mich. at 474. Consequently, Defendants are not entitled to summary judgment on Ms. Bletz's tort claims.

### D. Kitti Bletz is Not Entitled to Summary Judgment on her Assault and Battery, False Arrest, and False Imprisonment Claims at This Time.

Kitti Bletz cross-moves for summary judgment on her state law tort claims, but, as discussed above in the Court's analysis of her Fourth Amendment claim, the record is insufficient at this time to hold as a matter of law that Defendants are civilly liable for her prolonged detention. Most significantly, there appears to be a disputed issue of fact about the level of control Defendants exercised over the length and manner of her detention. Consequently, summary judgment in Ms. Bletz's favor is inappropriate at this time.

## CONCLUSION

Defendants' motion for summary judgment (docket # 26) is granted in part and denied in part, and Plaintiff's cross-motion for summary judgment (docket # 30) is denied at this time.   A separate Order consistent with this Opinion will enter.


Dated:     July 10, 2009                    /s/ Robert J. Jonker                              
                                       ROBERT J. JONKER
                                       UNITED STATES DISTRICT JUDGE